Case No. 13-7141, Nilo Jerez, Appellant v. Republic of Cuba et al. Ms. O'Connell for the Appellant, Mr. Krinsky for the Appellant. Good morning, Your Honors, and may it please the Court. My name is Richard O'Groll, and I represent the Appellant, Nilo Jerez. Mr. Jerez was a political prisoner who obtained a state court judgment in Florida against Cuba, the Castro Brothers, the Cuban Army, and the Interior Ministry. That judgment was supported by both pled and record facts showing that he was injured by an act of terrorism, the infection with a viral biological agent. After the time that Cuba was designated a state sponsor of terrorism in 1982 and after the time period when he became a U.S. citizen. Did you say he was affected by it? He was infected by it in terms of a viral infection. He had been infected by it right along before he became a citizen and before the designation of Cuba. Your Honor, the record is absolutely clear, and I don't think that there's any dispute that Mr. Jerez was injected with drugs of some nature while he was in Cuba. He then came, he was released from Cuba, spent five months in Spain, then came to the U.S. and became a citizen at least by the early 90s. The focus of the argument, though, is that it goes to the science, and it's the scientific nature of the Hepatitis C virus. Hep C replicates repeatedly, and once you are infected with Hep C, not everyone is injured by it and develops cirrhosis of the liver, but a good chunk, a percentage of people do. But the scientific facts that are in the record, the Rockefeller University report, clearly states that a Hep C virus will continue to replicate each day. It has a beginning point where it hijacks a healthy cell, it replicates in that cell, and then it destroys that cell, and then it goes on and does it again and again and again. And so, you know, it's if someone put a bomb on a plane in Cuba, it was flown to the United States, landed in Miami, the bomb exploded in Miami, causing death and injury. Well, here, the Hep C virus is like the bomb. Mr. Perez has been in the United States, has been a U.S. citizen since well before the 2000 judgment in his case was entered, and so each day he is undergoing a new detonation. So you have... Has his viral load increased each day or over time? It has absolutely increased over time, Your Honor, and he was dying to such an extent that, and the medical testimony is in the record, that in 1998 he was diagnosed as being in the early stages of liver cirrhosis. So what we have here is a situation, and I will tell Your Honors that it is unprecedented. There are no cases that speak directly to this point. So it's an issue that is somewhat unique, but given the possibility of biological attacks and the fact that the Congress, particularly when they enacted TRIA, specifically said that an act of terrorism, they defined it by referring to the Immigration and Naturalization Act, that an act of terror would include an attack by a biological agent. So we have Cuba admittedly injecting drugs into Mr. Perez. The easiest and most common way to get hepatitis C is to use a dirty needle, and given the facts that are in the record, sterility was not something that Cuba and its agents were concerned about when they were treating and torturing Mr. Perez. You get it from a dirty needle, he was infected with that hep C virus, he came to the United States, that virus is continuing to replicate each day, so you have a situation where you have both a tort and the injury occurring in this country. After Cuba was designated the state sponsor of terrorism in 1982, and after Mr. Perez became a citizen sometime in the 90s, the record is unclear as to the exact date, but the Florida Circuit Court did have before it in its record the fact of Mr. Perez's testimony in a criminal case against a person who was working in that Cuban psychiatric institution where he was tortured and was indicted for making false statements on his citizenship application. That trial transcript of Mr. Perez's testimony at that criminal trial was placed into the Florida Circuit Court record, and when the Florida Circuit Court judge entered the judgment against Cuba and the other defendants, he specifically said that he relied on extensive evidence, and he went on to say that he took judicial notice of the proceedings in the criminal court case. And that criminal trial held in 2002, Mr. Perez clearly testified that he was a citizen of the United States, there's a dispute about whether the transcript said 50 years, it should have said 15 years. But in 2002, five years before the judgment that Mr. Perez obtained in Florida, there was no doubt in the record that he was a citizen, there was no doubt in the record that he had Hep C, and there was no doubt also in the record that the Florida judge considered the Foreign Sovereign Immunities Act exemption. And under 1605A7, court below erred by not giving that judgment, seeking to execute against the assets, the intellectual property assets of Cuban's agencies and instrumentalities. That judgment should have been given full faith and credit. I think it's important to know that this state court judge did not simply ignore his responsibility under the Foreign Sovereign Immunities Act. He was well aware of it. That's because 11 days prior to his judgment in the Perez case, he issued a judgment in Haussler v. Cuba, a case that has gone up to various courts, including the Second Circuit recently. But at 207 Westlaw 6870681, Judge Wilson gave a judgment with an extensive discussion of the Foreign Sovereign Immunities Act and the A7 exception to immunity. He also had before him in the state court pleadings the fact that Cuba was a foreign state, that the Foreign Sovereign Immunities Act was expressly referenced in that complaint. The record is clear that the judge went on to hold a trial, as he recognized was required under Section 1608E. He did hold that trial. There is no transcript of that trial that exists. So we do not know precisely what was put before the court, but the court did clearly come down and say that Mr. Perez was infected by hep C. He was injured to the tune of several million dollars. Your Honor, my time is about to expire. Counsel, your reply brief doesn't respond to the citation of practical concepts in the appellee's brief. And I was wondering if you have a theory for answering that. Your Honor, practical, I think that the issue relates to whether or not it had to be pled. The Foreign Sovereign Immunities Act had to be pled. I may be thinking of a different case. Well, if I read practical concepts correctly, where the initial judgment is by default, then there's an effort or actually it isn't even an effort to enforce it. But it's sort of a preemptive strike against it under 60B. Once the defendant appears, the defendant has the right to challenge the jurisdictional judgment. And if it wins on that, then everything starts all over again on the merits. If it loses on that, then it has no chance to litigate the merits. And that seems to be completely consistent with the general law of judgments in the United States. Indeed, with Florida law of judgments. Your Honor, you're right. Florida law, under the Florida rules of civil procedure, judgment can be collaterally attacked if it's void. Yes, and I think McGee makes clear that where there has been a default and the defendant seeks to challenge jurisdiction, is entitled to do that. Your Honor, whether or not they are, first of all, Cuba and the other defendants have not actually appeared to challenge jurisdiction as a collateral attack. It's Cuban's agencies and instrumentalities. But even if that's the case, the standard would be, if you can collaterally attack, whether or not the judgment was void or was constitutionally infer. And according to the... I mean, the key thing to me is whether it's reviewed or resolved de novo by the later court, or in the case of practical concepts, the same court viewing it for the first time that the defendant appears, or whether there's any kind of deference at all to the initial judgment. And it seems to me practical concepts is pretty clear on that. Your Honor, Cuba had the opportunity to appear multiple times. That's always true in those cases. That's always true in the cases where that doctrine applies. But even assuming that that's correct, we believe that there's enough plaid facts and record facts that allows the court to find the existence of the immunity exception, and thus the judgment is not constitutionally inferred. That's on the tort renewing itself. I'm sorry, Your Honor. That's on the theory of the court, the tort renewing itself every day. That is correct, Your Honor. If the tort does not renew itself every day repeatedly, then the tort and the injury did not occur in the United States. Right. But we believe that both the tort and the injury does occur in the United States because of the unique scientific evidence of how hep C operates. Right. Thank you, Your Honors. Thank you. May it please the Court, Michael Krinsky for the appellees. On the plaintiff's replication theory, the Foreign Sovereign Immunities Act, 1605A5 and 1605A7, look exclusively to the act of the foreign sovereign. The only acts of the foreign sovereign here were taken within Cuba, and they were taken before the plaintiff became a United States citizen, which happened only after he left Cuba, and it took place before Cuba was designated a state sponsor of terrorism. So for these good and, I think, obvious reasons, there could be no jurisdiction under the Foreign Sovereign Immunities Act. The acts took place in Cuba and before the designation and before he became a citizen. The analogy to a terrorist putting a bomb on a plane that comes to the United States and lands here and explodes is really rather misplaced. Among other things, Cuba did not put Mr. Jerez on a plane to come to the United States. Cuba let the plaintiff leave Cuba. He went to Spain, in fact, and then he came to the United States. But more fundamentally, Cuba's actions that were found by the state court in Florida were not directed towards the United States. They did not use an instrumentality such as an airplane to take out an action within the United States. They were directed in Cuba towards a United States citizen. So the analogy fails. On practical concepts, we think it's entirely clear under practical concepts and under the case that relied upon it, that the second court reviews a default judgment, which is what we have here, on personal and subject matter jurisdiction, which we have both at issue, de novo. And the distinction is a sharp one between default judgments and judgments where the party has appeared and contested. What do you make of the purpose of 1608E? Excuse me, Your Honor? What do you make of the purpose of Section 1608E, duty of the initial court to find out that there's an adequate basis in the record for inferring that the district court was satisfied that the evidence supported the plaintiff's claims? The purpose is entering a judgment against a foreign sovereign. Asserting jurisdiction over a foreign sovereign is a sensitive matter, and the Foreign Sovereign Immunity Act did not want it to happen in the way, at least in many jurisdictions, a default judgment is taken, which is the other side doesn't show up, you get a piece of paper. Well, but why isn't the protection of practical concepts, and more broadly, the law of judgments that it exemplifies, ample? Well, for one thing, Your Honor, I think that this own circuit's decision in Transeiro, for instance, which I suggest is the law of the circuit, shows how this is supposed to work under the Foreign Sovereign Immunity Act. In Transeiro, Judge Mishler in the Eastern District of New York had a hearing. He addressed the FSIA issues. He came down on one side of the issue. This, the lower court here and this court on appeal, then reviewed that judgment and made its own. They know about determination at cause with Judge Mishler. And I suggest that it's particularly important in a sovereign immunities context for there to be collateral attack. Because often foreign states, for their own reasons of sovereignty, do not appear, default judgments are entered. And it's only when that judgment goes to be attacked and I'm the treater against agencies or instrumentality, property of agencies or instrumentalities, that a party normally appears and questions the jurisdiction. So the requirement of holding a hearing I think in no way alters the obligation of the second court to, when challenged, to review the jurisdiction subject matter and personal of the first court. I'd like to also say something about this particular judgment. It's a proper standard of review, I believe, is de novo under the three decisions of this court, Transervo, Practical Concepts, and Bell Helicopter. But even if this judgment was reviewed under a lesser standard, a more relaxed standard, it doesn't survive scrutiny. This is a very extreme case. The state court made none of the findings required by the Foreign Sovereign Immunities Act. The findings it did make negates sovereign immunity. The magistrate judge and the district court judge here in this district looked thoroughly at the record in the case, found nothing to support the requirements, the FSIA requirements for jurisdiction. And all of this was in the context of the Supreme Court having previously decided Amaretta-Hess, where it said that it is as clear as could be that the Foreign Sovereign Immunity Act is the only source of jurisdiction over the foreign state. And in fact, it was so clear that this court has sanctioned attorneys for relying on the Alien Tort Claims Act rather than the Foreign Sovereign Immunity Act in trying to invoke jurisdiction. So we think that under a de novo rule, a de novo standard, which is required both by the law of the circuit, which I suggest, and by Florida law, and either will suffice. Under de novo review, it cannot be, the judgment has to be set aside, not enforced, I should say, not set aside, not enforced here. And even under a more relaxed standard, this is an extreme judgment and cannot survive scrutiny, even if there were a relaxed standard that was applicable. I'd like in the short time remaining, Your Honor, to turn to plaintiff's failure to argue the Cuban Assets Control Regulations point, which was one of the grounds for decision by the magistrate judge. We think that failure to make that argument is fatal to plaintiff's appeal for two reasons. One is, as we understand it, the magistrate judge's order is before this court. The appeal brings both the magistrate's order and the district court judge's order. The only judgment, the only order, in fact, vacating the attachment and denying the court's motion for an attachment, is the magistrate judge's order, which is valid and self-operating until set aside, and it has not been set aside. So therefore, that order is before this court. The plaintiff has not argued one of the two grounds for that decision. Secondly, this court may affirm on any ground presented below. The Cuban Assets Control Regulations point was presented below, and the plaintiff, the appellant, cannot defeat the rule that you can affirm on any grounds presented below by simply not arguing the point. And here, there can be no reasonable claim of surprise. The magistrate judge addressed it, decided that issue. Both parties argued it before the district court judge. So we think on that point as well, Your Honor, the judgment should be affirmed because the plaintiff has not argued a necessary point. I have no time, apparently, to address the Cuban Assets Control Regulations trivia point itself, unless the court would have questions on that issue. Thank you very much, Your Honor. Thank you. If I might, with one point, Your Honor, give me about 30, 15 seconds additionally. I just would like to make it clear that the evidence that the plaintiff's counsel has relied upon here was not evidence, the scientific evidence, the evidence of purposeful injection of hepatitis C and so forth, was not in the state court proceeding. He just introduced that evidence in the proceeding below. Thank you, Your Honor. Thank you. You have no time left, but we'll give you two minutes of your little time. Thank you very much, Your Honor. I'm pleased to report. Just as to the last point, I don't believe that that is correct. Both in the state court pleading and in a statement by Mr. Jerez and in medical records that were before the Florida Supreme Court, there was extensive evidence of Mr. Jerez being injected by drugs, and there was also evidence that he had been diagnosed with liver cirrhosis as a result of his hep C infection. So that latter point I don't believe is correct. Mr. Kerensky talked about the United States not having an interest in this. Well, that's not the standard under 1605A7. You have to have a victim who was a U.S. national when the tort and the injury occurred, and we have that here. In addition, the U.S. clearly did have an interest in Mr. Jerez because, as is in the record, Cuba released him based on pressure from Senators Powell, Senator Javits, President Carter, and the Catholic Church. So this country clearly did have some interest in Mr. Jerez. What is your response to Mr. Kerensky's argument that the state court did not make any findings in showing that it was considering the FSIA and that the findings that it actually did make negated jurisdiction under that statute? Your Honor, we believe that the citation to the Alien Tort Claims Act was an error by counsel, which the court then picked up upon. However, you don't necessarily have to look to the label of a statute, as in the National Air Traffic Controllers case, as long as you have sufficient facts in the record that would support the exercise of jurisdiction, and we submit that we do. My time has expired, Your Honor. Thank you.
judges: Brown, Williams, Ginsburg